UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DOUGLAS BALLEW,

        Plaintiff,                                            Hon. Gordon J. Quist

v.                                                      Case No. 1:13-CV-437

COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.

_____/

## REPORT AND RECOMMENDATION

This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) under Title II of the Social Security Act. Section 405(g) limits the Court to a review of the administrative record, and provides that if the Commissioner's decision is supported by substantial evidence, it shall be conclusive. Pursuant to 28 U.S.C. § 636(b)(1)(B), authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of social security appeals, the undersigned recommends that the Commissioner's decision be **affirmed**.

## STANDARD OF REVIEW

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security

case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

**PROCEDURAL POSTURE**

Plaintiff was 43 years of age on his alleged disability onset date. (Tr. 151). He is a college graduate and worked previously as a controller, accountant, and vice-president/chief financial officer. (Tr. 24, 49). Plaintiff applied for benefits on March 15, 2010, alleging that he had been disabled since September 25, 2007, due to depression and post-traumatic stress disorder. (Tr. 151-52, 208). Plaintiff's application was denied, after which time he requested a hearing before an Administrative Law Judge (ALJ). (Tr. 73-150). On October 25, 2011, Plaintiff appeared before ALJ Joel Fina with testimony being offered by Plaintiff, a vocational expert, and a medical expert. (Tr. 30-72). In a written decision dated December 9, 2011, the ALJ determined that Plaintiff was not disabled. (Tr. 14-25). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (Tr. 1-5). Plaintiff subsequently initiated this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

**RELEVANT MEDICAL HISTORY**

On September 26, 2007, Plaintiff was hospitalized for treatment of depression. (Tr. 352-55). Plaintiff reported that "he has been depressed off and on much of his adult life" and was "feeling like maybe the best thing to do is leave his family and go get a job in a gas station in Montana." (Tr. 352). Plaintiff reported that he was recently employed as the CFO of a corporation but that "his employment there resulted in many legal issues [that] continue to weigh heavily on him." (Tr. 352).

Plaintiff reported that after leaving his position as CFO, "he and his wife purchased a business as a way to have a different sort of life and support themselves after he left corporate

America and it has not lived up to his expectations." (Tr. 352). Plaintiff reported that he had been receiving treatment for his emotional issues for several years, but recently discontinued taking his prescribed medication. (Tr. 352). Plaintiff reported that "he has used alcohol heavily in the past" and "experimented with marijuana in college and tried cocaine a couple of times." (Tr. 352-53).

The doctor concluded that Plaintiff "has a long history of worsening depression now marked by grief over business failure as well as the recent death of his father." (Tr. 355). The doctor further noted that Plaintiff "has a history consistent with PTSD." (Tr. 355). Plaintiff was diagnosed with major depression and posttraumatic stress disorder. (Tr. 355). Following admission, Plaintiff participated in therapy and resumed taking his medication. (Tr. 326). Treatment notes dated October 11, 2007 indicate that Plaintiff's depression and anxiety were "both much improved." (Tr. 326). Plaintiff's "mood was bright" and he "was feeling hopeful, doing affirmations, [and] denying cognitive distortions." (Tr. 326). Plaintiff was discharged on October 22, 2007 at which point his GAF score was rated as 60.[1] (Tr. 327).

On August 1, 2008, Jeffrey Santee, Ph.D., authored a report regarding Plaintiff's functional ability. (Tr. 588-90). The doctor reported that Plaintiff suffered from: (1) major depression-recurrent; (2) posttraumatic stress disorder; and (3) alcohol abuse - stable, long-term remission. (Tr. 588). The doctor reported that Plaintiff "is currently unemployed and unable to work due to the severity of his depression and posttraumatic stress disorder." (Tr. 588). The doctor observed that Plaintiff "has suffered from various bouts of depression and anxiety over the last 15

---

[1] The Global Assessment of Functioning (GAF) score refers to the clinician's judgment of the individual's overall level of functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994) (hereinafter DSM-IV). A GAF score of 60 indicates "moderate symptoms or moderate difficulty in social, occupational, or school functioning." DSM-IV at 34.

years, depending on the stressors he's had to deal with" and "at various times he has been prescribed psychoactive medications by his medical doctors and psychiatrists." (Tr. 589). With respect to Plaintiff's occupational history, the doctor observed:

> Doug has a history of corporate success in accounting, and has held various high-paying positions, such as CFO and Director of Finance at a number of companies. In 2002, he took a severance package from his CFO position at a company that was downsizing. About 6 months later, he became the CFO of a start-up hedge fund company run by his friend and neighbor. However, he resigned in December, 2004, after he became uncomfortable with the practices of the partners. Unfortunately, he was later indicted by the SEC along with the company's partners, despite the fact that he knows that he didn't do anything illegal. For almost four years, Doug has been fighting a legal battle to prove his innocence, which has consumed practically all of his life's savings.
>
> In July 2005, Doug took the position of Director of Finance at a new company. However, within a year, he was not able to handle the stressful demands of his corporate position along with the growing pressures and uncertainty of the SEC investigation. He was suffering bouts of depression, rage, and anxiety. Many days he reportedly was unable to even get out of bed.
>
> With the continuing pressures to support his wife and four children, Doug thought that it might be less stressful to work in an environment where he had more autonomy and control. In November 2006, he purchased a small sign business, using the remainder of his life savings. Unfortunately, the death of his father, the increasing legal pressures, and the stress of developing a new business proved to be too much for Doug. His mental health declined to the point that he was admitted to the Meadows inpatient unit, despite the fact that he was receiving outpatient psychiatric care and counseling.

(Tr. 589-90). With respect to Plaintiff's then current status, Dr. Santee reported:

> Doug's hospitalization, as noted earlier, was followed by his referral to me for intensive outpatient therapy. His latest outpatient therapy was complicated by his inability to focus on his own self-care and recovery while dealing with the SEC investigation, the closing down

of his sign business, the filing for bankruptcy, and ongoing marital conflict.  The SEC investigation has been settled.  Unfortunately, he and his wife are separated.

Due to his financial status, Doug had to discontinue his psychiatric and psychological treatment for now.  When last seen on May 22, 2008, Doug was still severely depressed, suffering from a profound sense of failure and low self-esteem, and unable to motivate himself to find a job in his field.  When last seen, he would not be able to have performed adequately in the corporate world, given his level of depression and lack of self-confidence.

(Tr. 590).

On May 21, 2010, Plaintiff was examined by John Peggau, Ph.D.  (Tr. 390-94).  Plaintiff reported that he was disabled due to depression, but when he was asked what symptoms he was experiencing, Plaintiff replied, "I don't know."  (Tr. 390).  With respect to his 2007 hospitalization, Plaintiff noted that "around that same time...he had a failing business and was getting sued by the SEC and Justice Department" and "was also going through a divorce and bankruptcy." (Tr. 390).

Plaintiff reported that on a "typical day," he showers, washes laundry, shops for groceries, prepares meals, and cleans.  (Tr. 391).  Plaintiff also reported that he generally reads or attends movies.  (Tr. 391).  Plaintiff reported that he has "a couple friends" with whom he stays in contact and he also "tries to keep up with the events and activities that his children are involved in." (Tr. 391).  Plaintiff reported that he exercises, "likes to take walks," and "spends some time doing e-mail."  (Tr. 391).  Aside from the fact that Plaintiff "was quite vague and...not forthcoming throughout the examination," the results of a mental status examination were unremarkable.  (Tr. 390-92).  The doctor concluded as follows:

> The claimant's primary issue is that he had these legal proceedings and problems with the company several years ago and now things seemingly are catching up to him. Records indicate that he did have infidelity on at least two separate [occasions when] he was married but he reluctantly acknowledge[d] that there was only one and it was really just before they were married. He had a history of using cannabis and drinking heavily and also using cocaine. He said that he had a DUI in 1986. He was having the problems with the failing business, the lawsuit by the SEC and the Department of Justice, going. He was filing bankruptcy, all simultaneously, when he ended up in the hospital because he had no other ideas on how to deal with it. Otherwise, the claimant presents as an individual who is functioning with some regrets in his life and is being supported by his disability insurance and investments.

(Tr. 393). Plaintiff was diagnosed with bipolar disorder and personality disorder with narcissistic features. (Tr. 393). His GAF score was rated as 68.[2] (Tr. 393).

On October 14, 2011, Dr. Santee completed an assessment of Plaintiff's "ability to do mental work-related activities." (Tr. 596-98). The doctor rated Plaintiff's abilities in 15 different categories encompassing: (1) making occupational adjustments; (2) making performance adjustments; and (3) making personal/social adjustments. (Tr. 596-97). The doctor reported that Plaintiff experienced "extreme" limitations in two categories, "marked" limitations in two categories, "moderate" limitations in three categories, "mild" limitations in six categories, and "no limitations" in two categories. (Tr. 596-97). The doctor also reported that Plaintiff experienced mild limitations with respect to activities of daily living, marked limitations in maintaining social functioning and maintaining concentration, persistence or pace, and experienced "one or two" episodes of decompensation. (Tr. 597). The doctor concluded that:

---

[2] A score of 68 indicates "some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 34.

> Mr. Ballew is making progress.  He still has good and bad days.
> When he began treatment his bad days were more frequent.  On those
> days he has difficulty getting out of bed, maintaining personal
> hygiene, and finding the energy to do basic activities of daily living,
> much less the energy to work outside the home.  He was having bad
> days several times per week when treatment began.
>
> Over time the frequency of his bad days has decreased.  He began
> feeling well enough to occasionally help a friend with some
> accounting issues which, in the summer of 2010, led to a part-time
> job.  Mr. Ballew still occasionally has bad days, but they are less
> frequent and have not interfered with his part-time work.  If he were
> to attempt to return to full-time work, I am uncertain about how the
> added stress and pressure would manifest themselves.  He currently
> functions at his limit performing part-time work.  A return to full-
> time work could well produce bad days of 4 to 6 times per month.

(Tr. 598).

At the administrative hearing, Plaintiff reported that he was not experiencing any physical impairments or limitations that limited his ability to work.  (Tr. 51-53).  Plaintiff reported that he was instead unable to work due to his emotional impairments.  (Tr. 53).  Plaintiff further testified, however, that he was presently working part-time as an accountant earning $1000.00 weekly.  (Tr. 36, 49-51).  Plaintiff testified that he had been successfully working in this position for approximately 18 months.  (Tr. 36).  Plaintiff's supervisor reported that Plaintiff completes all his work in a timely and satisfactory manner, does not require any special assistance, and "regularly report[s] for work as scheduled."  (Tr. 185-87).  Plaintiff's level of productivity was described as "100% of other employees' productivity."  (Tr. 187).

## ANALYSIS OF THE ALJ'S DECISION

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[3]  If the Commissioner can make a dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a).  The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining her residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and he can satisfy his burden by demonstrating that his impairments are so severe that he is unable to perform his previous work, and cannot, considering his age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528.  While the burden of proof shifts to the Commissioner at step five of the sequential evaluation process, Plaintiff bears the burden of proof through step four of the procedure, the point at which his residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*,

---

[3]1.  An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2.  An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3.  If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4.  If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5.  If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

The ALJ determined that Plaintiff suffers from: (1) depressive disorder; (2) post-traumatic stress disorder; and (3) alcohol abuse in remission, severe impairments that whether considered alone or in combination with other impairments, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 17-19). The ALJ next determined that Plaintiff retained the capacity to perform work at all exertional levels subject to the following limitations: he can perform work involving simple, detailed, and complex instructions, but is limited to only brief and superficial interaction with the public and co-workers, with no tandem tasks with other persons. (Tr. 19). The ALJ determined that Plaintiff could not perform his past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, his limitations notwithstanding. *See Richardson*, 735 F.2d at 964.

While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform specific jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can

perform, his limitations notwithstanding.  Such was the case here, as the ALJ questioned a vocational expert.

The vocational expert testified that there existed in the region at least 34,000 jobs which an individual with Plaintiff's RFC could perform, such limitations notwithstanding.  (Tr. 66-69).  This represents a significant number of jobs.  *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988); *Martin v. Commissioner of Social Security*, 170 Fed. Appx. 369, 374 (6th Cir., Mar. 1, 2006).  The ALJ concluded, therefore, that Plaintiff was not entitled to disability benefits.

**I.**          **The ALJ's Assessment of the Medical Expert's Testimony is Supported by Substantial Evidence**

Larry Kravitz, Ph.D. testified at the administrative hearing as a medical expert.  With respect to Dr. Kravitz's testimony, the ALJ concluded:

> Further, the conclusions in this decision are consistent with the testimony of the impartial medical expert, Larry M. Kravitz, Ph.D. The undersigned places significant weight on Dr. Kravitz's testimony that the claimant has had isolated incidences of socially inappropriate behavior and that he has been able to maintain persistence and pace such that he would be capable of sustaining the work indicated in the residual functional capacity.  Significantly, Dr. Kravitz also opined that the claimant['s] treatment record does not show any improvement since the alleged onset date, such that the claimant's current ability to engage in his current work activities shows that he also would have been able to sustain those activities after the alleged onset date.

(Tr. 23).

Plaintiff asserts that he is entitled to relief because the ALJ, in his opinion, misstated Dr. Kravitz's testimony.  The Court is not persuaded.

11

At the outset of the administrative hearing, Dr. Kravitz was asked by the ALJ, "is the record sufficient for you to reach a conclusion as to claimant's mental health condition?" (Tr. 34). Dr. Kravitz responded that he was unable to do so because he had not been provided with all of the exhibits of record. (Tr. 34-35). Specifically, Dr. Kravitz indicated that he had not been provided with Exhibits 7F through 14F, which consist of Dr. Santee's treatment notes and reports. (Tr. 418-600). At this juncture, the ALJ provided Dr. Kravitz with the entire administrative record and went off the record to afford Dr. Kravitz an opportunity to review such.[4] (Tr. 35).

After resuming the hearing, the ALJ asked Dr. Kravitz if he had an opinion regarding Plaintiff's mental health condition. (Tr. 36). After questioning Plaintiff at length, Dr. Kravitz indicated that he was prepared to offer an opinion regarding Plaintiff's condition. (Tr. 36-43). Dr. Kravitz indicated that Plaintiff suffered from depressive disorder, post-traumatic stress disorder, and alcohol abuse, in remission. (Tr. 43). The doctor further testified that Plaintiff experienced "mild to moderate" limitations with respect to his activities of daily living, "moderate" restriction in social functioning, and "moderate" restriction in concentration, persistence, and pace. (Tr. 44). After testifying concerning Plaintiff's impairments and limitations, the following exchange occurred between the ALJ and Dr. Kravitz:

> ALJ:   And Doctor, is it your assessment as previously described that those were the assessments since the alleged onset date in September of 2007 through today?
>
> ME:   Yes, I think that's reasonable.

---

[4] The hearing transcript does not indicate the duration of this interruption. Plaintiff asserts that the break lasted six minutes. While the Court is unable to independently verify such, the Court notes that Defendant has not challenged Plaintiff's assertion in this regard.

(Tr. 45).

Dr. Kravitz determined that Plaintiff's "mental health impairments" would be expected to "result in a limitation in his ability to function in a work setting." (Tr. 45). Specifically, the doctor reported that Plaintiff "would have difficulty in a work environment where he had to complete tasks collaboratively with co-workers [or] had to negotiate solutions but I think maintaining brief and superficial contacts is not beyond his capacity." (Tr. 46). Dr. Kravitz concluded that Plaintiff could perform work on a full-time basis subject to such limitations. (Tr. 46-47).

Following this testimony, Plaintiff was questioned by his attorney and the ALJ. (Tr. 48-63). Following Plaintiff's testimony, the ALJ asked Dr. Kravitz, "are there any other comments or questions that might have having heard [Plaintiff's] testimony?" (Tr. 63). In response, the doctor stated that after reviewing Dr. Santee's treatment notes he "would agree that claimant appeared to be struggling more around the time of his divorce" in December 2009. (Tr. 43, 64). Dr. Kravitz further observed that "one could argue that he was more depressed" at that point in time. (Tr. 65). Plaintiff argues that this latter statement by Dr. Kravitz is contradictory to the ALJ's observation that "Dr. Kravitz also opined that [Plaintiff's] treatment record does not show any improvement since the alleged onset date, such that [Plaintiff's] current ability to engage in his current work activities shows that he also would have been able to sustain those activities after the alleged onset date." (Tr. 23).

The Court fails to discern how Dr. Kravitz's later testimony undermines the ALJ's opinion or conclusions. Dr. Kravitz's observation that Plaintiff may have been "struggling more" and may have been "more depressed" at the time of his divorce is not contrary to his earlier

testimony regarding Plaintiff's functioning level or his conclusion that Plaintiff's functioning level remained relatively consistent from his alleged onset date through the date of the administrative hearing. Dr. Kravitz's testimony regarding Plaintiff's impairments and level of functioning enjoys substantial evidentiary support. Likewise, the ALJ's assessment of Dr. Kravitz's testimony is supported by substantial evidence.

Finally, to the extent that Plaintiff suggests that Dr. Kravitz's opinion would have been more favorable had he been given additional time to review the medical evidence, the Court notes that Plaintiff was represented by counsel at the administrative hearing and had every opportunity to challenge Dr. Kravitz's testimony and opinions. Plaintiff's failure to take advantage of this opportunity cannot now form the basis for relief. *See Beinlich v. Commissioner of Social Security*, 345 Fed. Appx. 163, (6th Cir., Sept. 9, 2009) (where claimant had an opportunity to cross-examine a witness so as to identify deficiencies in his testimony, the failure to do so does not constitute grounds for relief); *Ledford v. Astrue*, 311 Fed. Appx. 746, 757 (6th Cir., Dec. 19, 2008) (same); *Sims v. Commissioner of Social Security*, 406 Fed. Appx. 977, 982 (6th Cir., Jan. 19, 2011) (same). Accordingly, this argument is rejected.

II.        **The ALJ's RFC Determination is Supported by Substantial Evidence**

Plaintiff asserts that the ALJ "ignore[d] the variable nature of depression" and thereby overstated Plaintiff's ability to function. The Court disagrees. As is well recognized, the ALJ is not permitted to "play doctor" and speculate as to how a particular impairment manifests (or should manifest) itself. Thus, the relevant question is not whether depression, in general, is an impairment of a variable nature. Instead, the ALJ's task is to assess the evidence of record and identify

Plaintiff's impairments and the limitations resulting from such.  In this respect, the ALJ discussed the medical evidence in detail, including the evidence concerning Plaintiff's allegations of depression.  To the extent that Plaintiff suggests that the ALJ erred by failing to find that he suffers from significant variations of mood, such is simply not supported by the record.  The ALJ's RFC determination is amply supported by the medical evidence and Plaintiff's reported activities, including the fact that at the time of the administrative hearing Plaintiff had been working successfully for 18 months as a highly compensated accountant.  As the ALJ's RFC determination is supported by substantial evidence, this argument is rejected.

**III.        The ALJ's Assessment of Dr. Santee's Opinion is Supported by Substantial Evidence**

As noted above, Dr. Santee opined that Plaintiff is limited to a greater degree than recognized by the ALJ.  The ALJ, however, afforded "little" weight to the doctor's opinions. Plaintiff asserts that he is entitled to relief because the ALJ "identifies no valid reasons for rejecting" Dr. Santee's opinions.

The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and his maladies generally possess significant insight into his medical condition.  *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).  An ALJ must, therefore, give controlling weight to the opinion of a treating source if: (1) the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) the opinion "is not inconsistent with the other substantial evidence in the case record."  *Gayheart v. Commissioner of Social Security*, 710 F.3d 365, 375-76 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527).

Such deference is appropriate, however, only where the particular opinion "is based upon sufficient medical data." *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)). The ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence. *See Cohen*, 964 F.2d at 528; *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)); *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

If an ALJ accords less than controlling weight to a treating source's opinion, the ALJ must "give good reasons" for doing so. *Gayheart*, 710 F.3d at 376. Such reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." This requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Id.* (quoting *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004)). Simply stating that the physician's opinions "are not well-supported by any objective findings and are inconsistent with other credible evidence" is, without more, too "ambiguous" to permit meaningful review of the ALJ's assessment. *Gayheart*, 710 F.3d at 376-77.

If the ALJ affords less than controlling weight to a treating physician's opinion, the ALJ must still determine the weight to be afforded such. *Id.* at 376. In doing so, the ALJ must consider the following factors: (1) length of the treatment relationship and frequency of the

16

examination, (2) nature and extent of the treatment relationship, (3) supportability of the opinion, (4) consistency of the opinion with the record as a whole, (5) the specialization of the treating source, and (6) other relevant factors. *Id.* (citing 20 C.F.R. § 404.1527). While the ALJ is not required to explicitly discuss each of these factors, the record must nevertheless reflect that the ALJ considered those factors relevant to his assessment. *See, e.g., Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Undheim v. Barnhart*, 214 Fed. Appx. 448, 450 (5th Cir., Jan. 19, 2007).

The ALJ discussed in great detail the opinions offered by Dr. Santee and articulated several grounds for discounting such. (Tr. 18-23). The ALJ observed that while Dr. Santee opined that Plaintiff could not adequately perform work "in the corporate world," the doctor "did not suggest that [Plaintiff] would be unable to work in any sort of occupation." The ALJ noted that Dr. Santee's opinion that Plaintiff experiences "marked" limitation in social functioning is contradicted by Plaintiff's current level of functioning, including that Plaintiff "has sustained social interactions in his current work." The ALJ rejected Dr. Santee's opinion that Plaintiff experienced "marked" limitations in his ability to maintain concentration, persistence, and pace noting that Plaintiff "has been able to deal with all of those areas in his present work."

The ALJ also noted that Dr. Santee's opinions were inconsistent with substantial evidence in the record, including the testimony of Dr. Kravitz. The ALJ further observed that Dr. Santee's "treatment [of Plaintiff] has not been fully consistent with his reports. He alleges that his patient is 'unable to work,' yet he has not changed his treatment approach or ensured appropriate medication to improve [Plaintiff's] condition." In sum, the ALJ's conclusion to afford less than controlling weight to the opinions in question is supported by substantial evidence.

## **CONCLUSION**

For the reasons articulated herein, the undersigned concludes that the ALJ's decision adheres to the proper legal standards and is supported by substantial evidence.  Accordingly, it is recommended that the Commissioner's decision be **affirmed**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within fourteen (14) days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C). Failure to file objections within such time waives the right to appeal the District Court's order.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date:  April 14, 2014                                   /s/ Ellen S. Carmody
                                                        ELLEN S. CARMODY
                                                        United States Magistrate Judge